KATIE S. UNANGST, Plaintiff, *v.* CHARLES F. ROE et al.,
Defendants.

(Supreme Court, New York Special Term, June, 1919.)

**Pledge** — of securities as collateral for loans — assignment for benefit
of creditors — accounting — sureties — stockbrokers — title.

A firm of stockbrokers pledged with various banking insti-
tutions, as collateral for loans, certain securities left with them
by defendant R. together with securities belonging to customers.
of the firm, of which plaintiff was a margin customer. The firm
having thereafter made a general assignment for the benefit of
creditors the pledgees of the collateral resorted thereto to obtain
payment of their loan, and defendant R., claiming that he had
a position superior to the owners of the other securities pledged
with his own, upon delivering to the pledgees instruments which
gave them adequate protection, received from each of them any
surplus of securities or their proceeds after its loan was paid.
In an action to enforce plaintiff's claim that she and the other
margin creditors of the brokers were entitled to share in the
surplus to the exclusion of R. or at least ratably with him, and
for an accounting from him in regard to the surplus delivered
to him by a trust company, one of the pledgees, after it had
satisfied the brokers' indebtedness to it on certain loans, by a
sale of a portion of the collateral, *held*, that plaintiff and
defendant R., having authorized the pledge of their property
as security for the brokers' debt, each became to the extent of
their pledge a surety for such indebtedness and as between
themselves *co-sureties* even without agreement to that effect, and
such relationship continued so long as both continued sureties
for the same debt.

Until the trust company voluntarily released the securities
of R. from its lien they continued as collateral for the debt of
the broker firm, not through estoppel nor by reason of any lien
which the brokers had upon them, but because they had been
pledged by R's. authority and consent, and since the payment
did not affect his relation as surety for the debt of the brokers
it could not affect his relation as co-surety with plaintiff.

When because of the assignment for the benefit of creditors
the trust company was compelled to resort to the collateral

deposited as security for loans to the assignor, all the collateral was subject to the same obligation and lien and its owners as co-sureties were then entitled to contributions from each other for any loss sustained, and R., though he took the legal title to the stock by delivery from the trust company, must account for its value to his co-sureties. The rule that the court will not interfere with the legal title when the equities are equal has no application to the case.

ACTION for an accounting.

Robert Forsyth Little, for plaintiff.

Allen & Cammann (Henry W. Taft, William C. Cammann and George Coggill, of counsel), for defendant.

LEHMAN, J. On September 12, 1911, the firm of Van Schaick & Co., stock brokers, were compelled to make a general assignment. The defendant Roe had left with that firm a large amount of corporate securities and these securities were pledged, together with securities belonging to customers of the firm, with various banking institutions as collateral for loans. After the assignment by Van Schaick & Co. these banking institutions resorted to the pledged collateral to obtain payment of their loans. The defendant Roe claimed that he had a position superior to the owners of other securities pledged with his own as collateral for such loans and upon delivering to the banking institutions instruments which gave them adequate protection, apparently received from each of them any surplus of securities or their proceeds after its loan was paid. The plaintiff herein was a margin customer of Van Schaick & Co. and her securities had been pledged together with securities owned by the defendant as collateral for some of such loans, and she now claims that she and the other margin creditors are

entitled to share in the surplus to the exclusion of the defendant Roe or at least ratably with him. The action now under consideration has been brought to enforce this claim and to secure an accounting from the defendant in regard to surplus of collateral delivered to him by the Title Guarantee and Trust Company after it had satisfied the indebtedness of Van Schaick & Co. upon two loans, by sale of a portion of the collateral deposited as security.

These loans, for $50,000 and $100,000, were obtained by Van Schaick & Co. respectively on July 24, 1911, and July 27, 1911. By agreement with Van Schaick & Co. the trust company had the right to treat the collateral deposited in either loan as security for both and so far as concerns the issues of this action the two loans may be considered as one. After these loans were obtained Van Schaick & Co. from time to time changed the collateral with the consent of the trust company. At the time of the assignment by Van Schaick & Co. twenty shares of St. Louis and San Francisco Railway Company first preferred stock owned by the plaintiff was included in this collateral and 100 shares of stock of the National Biscuit Company, 100 shares of the American Telephone and Telegraph Company, 100 shares of the General Electric Company and 200 shares of the Distillers Securities Corporation owned by the defendant Roe. The stock owned by the plaintiff was part of a considerable amount of securities on which she owed the brokers the sum of $32,729.79. The stock owned by the defendant Roe was part of a very large amount of securities deposited with the brokers on which prior to August 30, 1911, he owed the sum of $259,098.78. On that date, however, upon the advice of his counsel and with knowledge obtained from Van Schaick that the firm was in a precarious condition, he ordered the sale of

sufficient securities held by Van Schaick & Co. to pay any debit balance owing to them and on the day of the assignment the remainder of the securities were the absolute property of Roe free from any claim upon them by the brokers. This debit balance was paid in order to enable Roe to demand his securities from the brokers and to place him in a superior position to that occupied by margin customers of the firm in regard to any securities which Van Schaick & Co. did not return. Roe did on the same day make a demand for his securities but the demand was certainly not peremptory calling for an immediate return of the securities, but according to the undisputed testimony was a " general " demand to have Van Schaick return them as soon as he could and was not intended to " embarrass " Van Schaick. Coupled with this so-called demand, Roe's attorney stated in his behalf to Van Schaick that he revokes " any authority which you may have had by reason of his indebtedness or otherwise to place his securities in loans," and he also requested that pending the delivery to Roe of his securities Van Schaick should so place the securities throughout the loans that they would bear the least burden possible. Prior to this time Roe had placed in Van Schaick & Co.'s office, Mr. Slade, his son-in-law, with authority to look after his interests, and Slade to some extent participated in the management of the affairs of the firm, at least so far as concerned the carrying out of the directions of Roe to place his securities throughout the loans so that they would bear the least burden possible. Under his general supervision Van Schaick & Co. at various times prior to September eleventh changed about the collateral in their loans including the loans under consideration, in order that Roe's securities might be placed in those loans where upon a sale of collateral the owners would

have the smallest loss or might be so distributed that so far as possible they would represent the probable margin between the value of the collateral and the amount of the indebtedness. From time to time during this period there were other conversations between Roe or his attorney and Van Schaick or his attorney, and at these conversations the " demand " of Roe was repeated and Van Schaick was again directed not to repledge any of Roe's securities if they " came on the counter." On September eleventh the situation became somewhat acute. Various customers demanded their securities and to free the securities demanded changes were constantly made in the collateral deposited in the different loans. In one case a bank loan in which 100 shares of American Telephone and Telegraph stock belonging to Roe had been deposited was paid and the collateral released but Roe's shares were thereupon deposited as collateral in the loans under consideration. Later in the same day Roe's son-in-law, on his behalf, demanded the delivery of certain other shares of stock which could be released from the loan in which they were placed only by the pledge of stock of other parties. His demand was complied with but promptly thereafter Van Schaick & Co. prepared to make a general assignment which was filed the following day. Immediately thereafter the defendant served a notice upon the Title Guarantee and Trust Company that he was the owner of the securities mentioned above and a demand that the trust company satisfy its lien by a sale of the other securities in its possession as collateral for the same loan. In accordance with this notice and demand the trust company resorted to the securities owned by Roe only in so far as the sale of the securities owned by other parties left a deficiency upon its loans, and delivered to him 100 shares of the stock of the General Electric

Company, 85 shares of the stock of the National Biscuit Company and the sum of $535.13, which represented the surplus of the collateral security after the loans were paid.

If Van Schaick & Co. had made their assignment prior to August thirty-first, and the trust company had then enforced its lien upon the fund deposited with it as security for the indebtedness due to it, it seems to me quite clear that the loss sustained by the owners of that fund would on well-recognized equitable principles have been imposed ratably upon all the owners. The plaintiff does not claim that Van Schaick & Co. did not have authority to pledge her stock with the bank and even within a month of the assignment the defendant Roe had delivered some of his securities to Van Schaick & Co. for the sole purpose of enabling them to pledge these securities with banks to raise money for their own purposes. This delivery was made with evident knowledge that the other securities previously deposited by him with Van Schaick & Co. were already being used for the same purpose, and there can be no real doubt that at that time Van Schaick & Co. had authority from the defendant Roe to pledge all his securities for their own benefit and that all pledges were actually made by virtue of that authority. The securities owned by the plaintiff and the defendant were consequently all subject to the lien of the trust company not through any estoppel but by the consent of the owners. All the collateral so deposited constituted one fund which was security for Van Schaick & Co.'s indebtedness and to the extent of their interest in the fund all the owners of this collateral were co-sureties and entitled in equity to an equal distribution of any loss suffered, and I can see no ground upon which any claim of priority of equity between two parties who have both given authority

for a pledge of their securities can be based. The payment by Roe of his indebtedness on August 31st and his subsequent efforts to obtain either his securities or at least a position, in regard to his securities, superior to that of margin customers have introduced in this case some novel elements. The defendant claims that by reason of these acts he is now the legal owner of the securities delivered to him, free from any equities on the part of the plaintiff, while the plaintiff claims that by reason of these acts the defendant has lost the right to ask contribution from his co-sureties or to share in the surplus of the fund which was security for the principal debt.

The mere fact that prior to the assignment of the brokers the defendant Roe paid his debit balance to them does not, I think, alter the situation except in so far as it increased the value of Roe's interest in such securities and might therefore change the proportion in which he would share in the proceeds of the fund. From that time he of course owned the securities free from any lien of the brokers. He had, however, given the brokers authority to pledge these securities with the banks and while the brokers might be under a contractual obligation to return the securities to him on demand, such a demand, even if peremptory and for immediate delivery, could not revoke *ab initio* the authority previously given or make tortious an act performed with the defendant's consent. The right of the lender to look to this collateral became fixed when the pledge was made. These rights were given to it by Roe's authority and neither Roe nor the brokers could change these rights without the lender's consent. The payment of the debit balance to the brokers freed the securities from the lien of the brokers but did not free them from the lien of the banks to which they had been pledged. They could be freed from that lien and

the right to immediate possession revested in the defendant only if the debt to the bank was paid or a substitution of collateral made with the consent of the lender. It is contended, however, that even though as between the defendant Roe and the lender the payment of the debit balance and the so-called demand was without effect, yet as between him and the owners of the other collateral it placed him in a superior position. I cannot see upon what principle this claim is based. The right of contribution among co-sureties arises from the nature of the relationship. The relationship in this case arises from the fact that both the plaintiff and the defendant Roe have given authority, express or implied, to the brokers to pledge their property as security for the brokers' debt, and that through such pledge each has become to that extent a surety for such indebtedness, and as between themselves co-sureties, even though without any agreement on their part. So long as both continue sureties for the same debt the relationship of co-sureties continues with all its usual results. Until the trust company voluntarily released the securities of Roe from its lien they continued as collateral for the debt of Van Schaick & Co., not through estoppel nor by reason of any lien which Van Schaick had upon them, but because pledged by Roe's authority and consent; and since the payment in no wise affected his relation as surety for the debt of the brokers, it could also in no wise affect his relation as co-surety with the plaintiff which arose as a necessary concomitant; and Roe obtained no better right by reason of his payment than he had before. Certainly as to the securities which belonged to Roe and which were deposited in this loan thereafter with his consent and by his request in order to lighten the burden which would rest upon the whole mass of his securities if Van Schaick & Co. were unable to pay their debts,

the previous payment and demand for all the securities was merely an empty form.

There is, however, one claim made by the defendant Roe which in my opinion is more serious. Even though he could not revoke *ab initio* his authority to pledge his securities he could revoke it for the future, and if thereafter the brokers used his securities when freed from the lien of the earlier pledge as collateral for a new loan, such repledge would, in my opinion, constitute a larceny, and while the lender might obtain a lien upon them by estoppel that estoppel would be enforced only in his favor and not in favor of the other sureties for the brokers' debts. In the present case at the same time as the defendant Roe made his somewhat equivocal demand upon the defendant for the return of the stock, he also specifically revoked any authority to repledge stock which came into the brokers' hands freed from the lien of the loan for which they had previously been pledged. This revocation was, however, coupled with the direction to change about the securities for the defendant's benefit in the various loans and, of course, in so far as the brokers carried out the direction with the knowledge and consent of Roe's agents this revocation was to that extent ineffective and this limitation upon the revocation undoubtedly affects all the securities in the loans under consideration placed therein after August thirty-first, except perhaps the 100 shares of American Telephone and Telegraph stock which were placed therein on September eleventh. Even if, however, the defendant Roe was entitled to receive the value of this stock out of any surplus remaining after the loan was paid, which for reasons hereinafter set forth I seriously question, he has received more than the value of this stock and the plaintiff would still be entitled to the relief asked in the complaint, viz., an accounting. I am not, how-

ever, satisfied that even this stock was wrongfully
pledged. It appears clear that Roe and his agents did
not object to Van Schaick & Co. delivering securities
to their customers in the regular course of business
upon demand; in fact, if such demands were refused
the failure of the brokers would have been precipi-
tated and the plan of Roe and his attorneys to free his
securities so far as possible from the burden imposed
upon them by their pledge would have been frus-
trated. It appears from the books of Van Schaick &
Co. that the 100 shares of American Telegraph and
Telephone stock were originally deposited in a bank
loan with securities belonging to a customer who had
made a demand and there is evidence that Roe's agent
consented that this demand should be met. Appa-
rently in order to comply with this demand and the
demands of other customers this loan was paid; the
securities of this customer contained therein were
returned to him and Roe's 100 shares of stock were
substituted in the loans under consideration to release
stock of this and other customers who had demanded
its return. There is no direct evidence that Mr. Slade,
Roe's son-in-law and agent, knew or approved of the
repledge before it was made, but there is evidence that
he was " poring " over the books all day long and
that on the same day by his direction certain shares
of stock belonging to the defendant Roe, of greater
value than the 100 shares of American Telephone and
Telegraph Company stock, were released from another
loan and returned to him, through the substitution of
stock belonging to other customers which were con-
tained in the loan that had been paid. In the absence
of protest when he learned of the repledge and in view
of the fact that Roe through his agent obtained an
actual advantage by the payment of the earlier loan,
it might well be inferred that Roe did not intend to

Supreme Court, June, 1919.　　　[Vol. 107.

revoke authority to repledge stock belonging to him
contained in loans which the firm was compelled in the
ordinary course of business to take up when such
repledge was made to meet current obligations or to
benefit himself. This inference would be strengthened
if it appears from the books that while Mr. Slade was
looking after the interests of the defendant Roe other
repledges were made for such purposes. I am not in
a position to examine the books to determine whether
there have been such other transactions, but since in
any event there must, in my opinion, be an accounting
and this question affects only the amount which may
be due from Roe upon such accounting, such examina-
tion can be more properly made upon the reference.

Finally, the defendant Roe claims in effect that even
though the equities of the parties may be equal, he
has received the legal title to the stock by delivery
from the trust company and that a court of equity will
not interfere with the legal title where the equities are
equal. The rule invoked by the defendant seems to me
to have no application to the facts in this case. The
rights of the parties between themselves became fixed
when the brokers made their assignment and the trust
company was compelled to resort to the collateral
deposited as security. All of that collateral was sub-
ject to the same obligation and lien and its owners as
co-sureties were entitled then to contribution from
each other for any loss sustained. Their rights could
not be changed or determined by any hazard of chance
in the order of sale or by any selection of the pledgee
bank. It follows that the defendant could gain no
advantage by the delivery of the stock to him and must
account for its value to his co-sureties. *Whitlock* v.
*Seaboard National Bank,* 29 Misc. Rep. 84.

The only question that requires further consideration
is raised by the contention of the plaintiff that the par-

ties were co-sureties on August thirty-first; that one co-surety may not take any steps to defeat the rights of his co-sureties; that the acts of the defendant Roe, performed with knowledge of the situation, in paying his indebtedness, obtaining the return of part of his stock, making substitutions of collateral and demanding the sale of the collateral belonging to the other parties before resort was had to his own securities, were calculated to and did impair the rights of his co-sureties and should in equity deprive him of all right to contribution from them. The entire contention seems to me to be based on the premise that the rights of the parties as co-sureties became fixed as soon as the relationship of co-sureties came into existence. That premise seems to me unsound. They became co-sureties without agreement between themselves by reason of the fact that they were sureties for the same debt and that relation could be destroyed without agreement between themselves whenever they ceased to be sureties for the same debt. The principal debtor and the creditor could by agreement at any time change the collateral and by such change could alter or destroy the co-suretyship existing among the owners of the collateral previously deposited. Any customer had the right to demand his stock and the broker was under a contractual obligation to deliver it. If he secured its release from the lien of the loan and returned it to the owner, he might impose a greater burden upon the remaining securities but the other owners could not complain, for their rights to contribution did not become fixed until resort to the fund was necessary in order to free any part of it from the lien of the debt. Until that time the defendant had the right to receive the return of part of his stock and to endeavor to cause a rearrangement of the collateral for his own benefit. He had not agreed to become or remain a co-surety

Supreme Court, June, 1919. [Vol. 107.

with the other parties and he owed them no obligation except such obligation as the law imposed when the rights of the parties became fixed.

I have not considered it necessary to consider at length the defense of laches raised by the answer. The plaintiff is seeking to enforce a property right and has no other adequate remedy. She has brought the action within the time limited by law, and there is no proof that by her delay she has caused any damage to the defendant.

Interlocutory judgment will therefore be directed for the plaintiff and a reference will be ordered to take the account.

Ordered accordingly.