In the Matter of the Application of UNITED STATES TRUST COMPANY OF NEW YORK, as Executor, etc., of CHARLES F. ROE, Deceased, Petitioner, for a Certiorari Order against JOHN F. GILCHRIST and Others, Constituting the State Tax Commission, Respondents.

Third Department, November 13, 1924.

**Taxation — personal income tax — deductions for loss sustained during taxable year — taxpayer had in 1911 margin account with brokers secured by collateral — collateral was used by brokers to secure their own loans — customer's account was closed out and securities not sold were allowed to remain with brokers — more securities were loaned to brokers — upon failure of brokers in 1911 securities of other customers were sold in preference to taxpayer's securities — other customers secured judgments against taxpayer in 1920 based on said fraudulent preference — amount of said judgments not deductible under Tax Law, § 360, subd. 5, as loss sustained during 1920 incurred in transaction entered into for profit — amount of said judgments not deductible under Tax Law, § 360, subd. 7, as debts ascertained to be worthless and charged off during taxable year — voluntary loan not for purpose of protecting taxpayer's interest in margin transaction — burden is on taxpayer to show amount deductible — so-called loss was sustained by wrongful act in procuring discrimination in sale of collateral.**

In certiorari proceedings to review the action of the State Tax Commission in refusing to allow certain deductions in determining personal income tax, claimed by a taxpayer on the ground that they represented losses sustained during the taxable year, it appeared that the taxpayer in 1911 had a margin account with a stock brokerage concern with whom he had deposited securities as collateral and

to whom he had given permission to use the securities as collateral for its loans; that in the same year the taxpayer's account with the stock brokerage firm was closed and a part of the securities were sold to meet his obligations to the firm; that the securities remaining unsold were left in the possession of the firm and were pledged by it as security for firm notes; that at about the same time the taxpayer voluntarily delivered to the firm other securities not as collateral for a margin account but for the purpose of enabling the firm to use·them for collateral for its own purposes; that a short time after those securities were loaned the stock brokerage firm made a general assignment for the benefit of creditors and was placed in involuntary bankruptcy; that following the bankruptcy of the stock brokerage firm the collateral held by a bank to secure a loan to the firm was sold but through the connivance of the taxpayer the securities of other customers were sold first and the securities of the taxpayer were sold only to the extent required to satisfy the deficiency arising after the sale of the other collateral; that in 1920 the other customers of the firm brought actions against the taxpayer to compel him to bear his share of the indebtedness for which his collateral had been pledged with theirs by the firm and secured judgments against him; and that it is the amount of these judgments that the taxpayer would have deducted from his gross income for the year 1920.

*Held,* that the amount of said judgments is not deductible under subdivision 7 of section 360 of the Tax Law which allows deductions for debts ascertained to be worthless and charged off within the taxable year, since any loss suffered by the taxpayer was not a debt ascertained to be worthless in 1920, for the only debt due the taxpayer is the indebtedness or the obligation of the stockbrokers on account of the securities belonging to the taxpayer which it held at the time of its assignment in 1911;

That the amount of said judgments is not deductible under subdivision 5 of section 360 of the Tax Law on the ground that it is a loss sustained by the taxpayer in the taxable year 1920 incurred in a transaction entered into for profit.

It is not clear that the act of the taxpayer in leaving with the stockbrokers, after his account was closed out, the remainder of the securities which he had put up to protect his margin account, was incidental to the margin transaction, which was entered into for profit; but, even if that were true, still the act of the taxpayer in voluntarily loaning other securities to be used by the stock brokerage firm to secure their own loans was not for the purpose of protecting the taxpayer's own interest nor was it incidental to his margin transaction.

If it be held that a loss in connection with the margin securities might be one sustained in 1920 in a transaction entered into for profit, the State Tax Commission was right in refusing to make the deduction, since the taxpayer failed to sustain the burden of proof by showing what part of the securities were used in the margin transaction and what part were loaned to the stock brokerage firm after the margin account had been closed.

Furthermore, if any so-called loss could be considered as a loss in his margin transaction it would be a loss sustained by the sale of his collateral. But no such loss was sustained since his collateral was not sold.

The so-called loss of the taxpayer was sustained in a separate transaction, namely, his wrongful act in procuring discrimination in the sale of collateral, which act formed the basis of the judgments against him by the other customers. This was a scheme to avoid a loss but not a transaction entered into for profit.

When the taxpayer paid the judgments in 1920 he simply returned to the other customers that which he had wrongfully taken from them in 1911, and, therefore, in paying these judgments his estate was not depleted and he suffered no loss thereby.

CERTIORARI ORDER granted out of the Supreme Court at the Albany Special Term and entered in the office of the clerk of the county of Albany on the 11th day of October, 1923, directed to the Tax Commission of the State of New York, commanding them to certify and return to the office of the clerk of the county of Albany all and singular its proceedings had in connection with its determination of the income tax due to the State of New York from Charles F. Roe, the petitioner's decedent, for the year 1920.

*Caldwell & Raymond* [*J. H. Caldwell* and *Charles C. Marshall* of counsel], for the petitioner.

*Carl Sherman,* Attorney-General [*William D. Morrow* of counsel], for the respondents.

VAN KIRK, J.:

Charles F. Roe, in making his income tax return for the year 1920, deducted from the gross income the sum of $110,800, which he claimed was a loss sustained during the taxable year. The Tax Commission refused to allow the deduction and assessed the tax, which was paid under protest. An application made for a recomputation and resettlement of the tax has been denied. The matter is presented here upon stipulated facts, in which reference is made to *Unangst* v. *Roe* (107 Misc. Rep. 516), we assume for the purpose of a more complete statement. Mr. Roe, it is conceded, had been for many years a margin customer of the stock brokerage firm of Van Schaick & Co., and on August 30, 1911, had an account with them, on which he owed $259,098.78, the firm holding securities in a large amount (the amount not stated) as collateral. Roe had given authority to the firm to pledge these securities for the general loans of the firm at the banks. On August 30, 1911, in response to Roe's order, the firm sold enough of his securities in his margin account to pay all of his indebtedness to the firm. There remained in the firm's hands a large amount of these securities and, after the payment of his indebtedness, these belonged to Roe, free and clear of any claim on the part of the firm. These securities thus became his absolute property and subject to his order, except that they were pledged as collateral for firm notes. Also within a month prior to September 12, 1911, Roe had voluntarily delivered to the firm other securities (the amount not stated), not as additional collateral to his margin account, but for the sole purpose of enabling the firm to use them as collateral for its own purposes. These latter we shall call his loaned securities and the former his margin securities. On September 12, 1911, the firm made a general assignment for the benefit of creditors. At that time the Roe securities,

34

both those from the margin account and those loaned, were pledged, together with securities belonging to other customers of the firm, in banks as collateral for firm loans.   Directly after the assignment the banks resorted to the collateral to obtain payment for their loans. On demand of Roe upon the banks, in which such collateral was pledged, they first sold the collateral of the other customers and resorted to the collateral belonging to Roe only so far as required to satisfy any deficiency after the collateral of others had been exhausted; and the bank, after its note had been so paid, delivered to Roe all collateral pledged and not sold.   The other customers, all of whose collateral had thus been sold, brought actions against Roe to compel him to bear his share of the indebtedness for which his collateral had been pledged with theirs, claiming that he was a cosurety with them.   In these actions judgments were recovered against Roe and paid by him in February, 1920.   It is the amount of these judgments he would have deducted from his gross income for the year 1920.

Before the Tax Commission the taxpayer claimed the deduction as a loss sustained by him in the taxable year 1920 and not compensated for by insurance or otherwise, incurred in a transaction entered into for profit, though not connected with his trade or business; that is under the provisions (in the words substantially) of section 360, subdivision 5, of the Tax Law (added by Laws of 1919, chap. 627, as amd. by Laws of 1920, chap. 693).*   The State Tax Commission disallowed this deduction because " the liability existed prior to January 1, 1919."

The petitioner now claims also that the loss is deductible under subdivision 7 of section 360 of the Tax Law (as added by Laws of 1919, chap. 627),† which allows deductions for " Debts ascertained to be worthless and charged off within the taxable year."   Any loss here is not a debt " ascertained to be worthless " in 1920.   The only debt covered by this subdivision would be one due Roe. The only debt due Roe disclosed here is the indebtedness or obligation of Van Schaick & Co. on account of the securities belonging to Roe, which it held at the time it made its assignment.   The firm was obligated to return to him these securities. The firm was adjudged bankrupt under a petition in involuntary bankruptcy filed November 17, 1911.   This obligation to return the securities was ascertained to be worthless long before 1920. The deduction claimed here is in no wise connected with any loss resulting from that obligation.

We then turn to the claim made for this deduction under sub-

* Since amd. by Laws of 1921, chap. 477.— [REP.

† Since amd. by Laws of 1921, chaps. 214, 477.— [REP.

division 5, *supra;* and the questions are (1) whether or not Roe or his estate, in 1920, sustained a loss; and (2) if so, was it sustained in a transaction entered into for profit?

What were the relations between Roe and the firm? In the beginning Roe entered into a " transaction " with the firm as one of its margin customers. This was a transaction entered into for profit. But, on August 30, 1911, when the firm, at Roe's order, sold sufficient of his collateral to pay his entire indebtedness, his account as customer of the firm was closed. So far as the firm was concerned Roe then became the absolute owner of all of the remaining margin securities; he was also, so far as this record shows, the owner of the loaned securities. Thereafter he was not a margin customer of the firm and it was no longer contemplated that securities were to be bought or sold by the firm for him; but his securities were left with the firm and he stood thereafter simply as its creditor. No claim for a deduction is made here on the ground that he had lost in the purchase or sale of securities in his margin account. It is not clear that the leaving of his margin collateral with the firm, after his margin account had been closed, was incidental to this first transaction. When he made his demand for the return of his securities, it was not a peremptory demand, not one intended to " embarrass " the firm, but rather to procure from the firm as quickly as possible his securities. It is very plain that Roe was more than ordinarily interested in this firm. He was willing to risk all his securities for the benefit of the firm and open discrimination in his favor in the sale of collateral was rendered to him. The voluntary delivery of securities to the firm was not a transaction entered into for profit. Apparently no terms or conditions were attached to the loaning of these securities. How or when they were to be returned or paid for we do not know. We are not informed even that he was to receive interest during the period of the loan. If then we now concede, without so deciding, that the leaving of the margin securities was incidental to and a part of his margin transaction, we think it cannot be said that his voluntary loan of securities was for the purpose of protecting his own interests, or was incidental to his margin transaction. The State Tax Commission was not informed what the amount of these loaned securities was; and, if it be held that a loss in connection with the margin securities might be one sustained in 1920 in a transaction entered into for profit, the Commission had no means of determining the amount of that loss to be deducted. Such a deductible loss by Roe would depend upon the ratio between the amount of his collateral pledged and that of the other customers for a loan, and further on the proportion of his margin collateral to his loaned

collateral. The Tax Commission had no means of telling what part of Roe's securities, among the collateral for a loan, was made up of the margin securities; so it could not determine what part of any loss sustained would be deductible. It was for the taxpayer to establish his right to a deduction and the amount thereof. He failed in this proof. But further, if any so-called loss, disclosed in this record, could be considered as a loss in his margin transaction, it would be a loss sustained by the sale of his collateral; but no such loss was sustained; his collateral was not sold. His so-called loss was sustained in a separate transaction, namely, his wrongful act in procuring discrimination in the sale of collateral favorable to himself. This was a scheme to avoid a loss, but not a transaction entered into for profit within the meaning of the statute, the effect of which we will now consider.

While Roe, after his debt was paid, owned the remaining securities absolutely and the firm had no further claim upon them, they and the loaned securities were still, by Roe's consent, subject to the lien of the banks, to which they had been pledged with the consent of Roe. After the firm made its assignment, had Roe not sought to secure an unfair advantage over other customers, whose collateral was pledged with his, his loss would have been suffered and its amount determined when the collateral was sold to pay the secured notes, namely, some years before 1920. When he did secure this unfair advantage, through favor of the banks and the firm, the collateral of the others was exhausted; he took the entire surplus collateral. The others bore what should have been his loss and the only loss he could have sustained which could be deductible in an income tax return. In effect he then took property which belonged to others; the court in the *Unangst Case (supra)* so determined. That property was never rightfully a part of his estate; his apparent estate included assets not his. When he paid the judgments he simply returned to the plaintiffs in 1920 that which he had wrongfully taken from them in 1911. In paying these judgments his estate was not depleted and he suffered no loss thereby. In this sense the ruling of the State Tax Commission was right.

We conclude, therefore, that there was no loss sustained by Roe or his estate in 1920, in a transaction entered into for profit.

Roe having died his executors have been substituted.

The determination of the State Tax Commission should be confirmed, with costs.

Determination unanimously confirmed, with fifty dollars costs and disbursements.